IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                        Case No. 18-10064-JWB

JUAN CARLOS CARMONA,

    Defendant.

**MEMORANDUM AND ORDER**

This matter is before the court on Defendant's Motion to Suppress and Supplemental Motion to Suppress. (Doc. 20, 26.) The motions are fully briefed. (Docs. 25, 28, 31.) The court held an evidentiary hearing on August 29, 2018, and took the motions under advisement. The court is now prepared to rule. For the reasons stated herein, Defendant's initial motion (Doc. 20) is DENIED and his supplemental motion (Doc. 26) is GRANTED IN PART and DENIED IN PART.

**I. Facts**

The court finds the following facts from the evidence presented at the hearing. Special Agent Glenn Gregory of the Federal Bureau of Investigation (FBI) is assigned to an FBI violent crimes task force in its Houston, Texas, division. The task force consists of officers from the FBI, the Harris County Sheriff's Office, and the Texas Department of Public Safety. Gregory has been designated as the task force's kidnapping coordinator for the last sixteen years.

On the afternoon of May 9, 2018, at around 3:00 p.m., Gregory's supervisor notified him of a report by the FBI's Kansas City office of what was classified as a suspected kidnapping. Gregory contacted FBI Special Agent DiCaprio of the Kansas City office and was provided with information about the case. Gregory was informed that L.M., a fifteen-year old girl from

Hutchinson, Kansas, had gone missing. The National Crime Information Center (NCIC) maintains a database on missing children; L.M. was entered in NCIC as a missing child on May 7, 2018. DiCaprio informed Gregory that Hutchinson police had been able to locate video of a local store parking lot that appeared to show L.M. meeting on several occasions with the driver of a Chevrolet Camaro bearing a Texas license plate. The video appeared to show L.M. leaning into the car and kissing the driver. Officers were able to identify the registrant of that vehicle as Juan Carmona, the defendant in this case. A records check showed that Defendant, a thirty-six-year-old male, listed a Houston, Texas, address as his residence on a (since expired) Texas driver's license. A records check of a Harris County database showed that the sheriff's office had contact with Defendant in 2012 on a matter listed as indecency with a child, although no other information about the matter was provided. Officers could not determine a current address for Defendant.

Gregory and his team ran a check through a license-plate-reader database – compiled from vehicles that photograph license plates in public places – in an attempt to locate the Camaro in the Houston area. He found evidence that on the previous two days (May 7 and 8), Defendant's car had been parked at an InTown Suites motel in Houston. Gregory and other officers went to the motel and, at about 6:30 p.m., they located the Camaro, unoccupied, in the parking lot. Gregory spoke to motel staff and learned that Defendant was registered in Room 340, with an additional guest listed on the registration as "L. [the missing minor's first name] Carmona."

Based on Gregory's training and experience, the circumstances indicated to him that L.M. was likely a victim of sexual exploitation by Defendant. Because of the danger of sexual exploitation of a minor, Gregory believed it was necessary to enter the room as soon as possible to ensure the safety of L.M. Gregory did not have sufficient officers at the motel at that point, in his estimation, to forcibly but safely enter Defendant's room. It would have taken an hour or so to

assemble the other FBI task force officers. An officer with Gregory who was a member of the Houston Police Department (HPD) indicated that a tactical unit from the HPD was nearby and could assist with the entry. The unit was summoned, and Gregory obtained a key card to Room 340 from the motel staff.

When the unit arrived and was ready, the officers (approximately ten to twelve in total) proceeded up the outdoor stairway to the third-floor balcony outside Room 340. Most of the relevant events were captured on the "bodycam" recording device of Houston Police Officer Jeremy Hicok. (Govt. Exh. 2.) Officers gathered near Room 340 and adjacent rooms as well, because in Gregory's experience sexual exploitation of minors sometimes involves groups of people or other juveniles in nearby motel rooms. Several of the officers were heavily armed, wore tactical vests, and had guns drawn. Gregory had instructed the officers that any adult in the room that would be of concern to them should be temporarily detained and handcuffed for the safety of the minor and the officers. In his testimony, Gregory explained this was done as a precaution because the officers did not know the situation they would be facing, and if a person in the room made furtive movements, it could cause officers to take aggressive action, possibly injuring a detainee or others.

At about 7:00 p.m., an officer inserted the key card into the door of Room 340, knocked, opened the door, and announced "Houston police." Defendant was standing inside the room looking at the officers. An officer with his gun drawn said, "Show me your hands," which Defendant did. The officer then directed Defendant to walk out of the room, which he did. The officer's voice and manner were calm; Defendant appeared calm as well. Officers saw a young female sitting on the bed in the room, and the officer with his gun drawn directed her to show her hands. The female did so and was then escorted out on the balcony a short distance away.

3

Meanwhile, an officer on the balcony began handcuffing Defendant's hands behind his back and had him stand near the door as other officers entered the room.

Defendant immediately asked, "What's going on?", to which the officer handcuffing him said, "What do you mean what's going on?" When Defendant repeated his question, the officer said, "You are going into custody, man." Defendant asked, "What for?," prompting the officer to ask, "How old is your wife?" When Defendant said, "Excuse me?," the officer said, "I mean if you're going to play dumb with me, I'll just play dumb with you," as he patted Defendant down for weapons. The officer pointed to Gregory and told Defendant Gregory was the one in charge so "for right now you just get to stand there in handcuffs, okay?" Defendant said "okay." Officers cleared the motel room at that point and determined no one else was inside.

Gregory meanwhile escorted L.M. just around the corner of the balcony, out of sight of Defendant, and asked who she was and whether she was injured. After L.M. identified herself, Gregory asked who she was with and what their relationship was. L.M. said she was with Defendant and that they were dating. When Gregory asked what that meant, L.M. indicated they had a sexual relationship, asserting they had engaged in "consensual sex." L.M. conveyed this information to Gregory within one minute of the time officers handcuffed Defendant on the balcony.

Officers propped open the door to the room, and several of them went in and out of the room. There was no evidence they looked for or found any incriminating evidence in the room at that point, although they were apparently looking around the room. One of them asked Defendant, "You like ranch with your pizza?," apparently referring to items in the room, to which Defendant said, "Yeah."

Agent Gregory returned to the room a minute or two later and asked Defendant to come inside (Room 340) to talk. There was very little room outside on the balcony. Defendant was escorted into the room by an officer. The door to the room remained open, with one officer standing in the doorway and another officer (with the body camera that recorded the events) standing in the room just in front of Gregory and Defendant as they stood talking. Gregory asked Defendant's name (which he gave), and identified himself as an FBI agent. Gregory asked Defendant if he knew why they were there. Defendant appeared to shake his head yes but did not answer. Gregory said he would assume the head shake meant "yes," but said he would explain. He told Defendant the Hutchinson police contacted them, that L.M. was reported missing, that there was video of L.M. and Defendant's car in Hutchinson, and that L.M. had already admitted engaging in a sexual relationship with Defendant. Gregory said he needed to know if anything else was going on, to which Defendant shook his head "no." Gregory asked if Defendant had made L.M. have sex with anyone else; Defendant indicated "no." Gregory asked if Defendant had rented the room; Defendant answered "yes." Gregory asked if there was anything in the room that would hurt the officers if they looked through the room; Defendant said "no." Gregory asked, "Can I get your permission to look through the room," to which Defendant shrugged and said, "Sure." Gregory said, "I can't make you" and "you can say no" to a search. Defendant again shrugged, hesitated, and said, "sure," indicating he would agree to a search. Gregory went to obtain a consent to search form. An officer closed the motel room door while L.M. was escorted past the doorway, and then opened the door again as Defendant sat on the bed waiting, still handcuffed. Gregory returned after several minutes with a consent form, had the door to the room closed, and reviewed the consent-to-search form with Defendant, as two other officers stood in the room. Gregory had Defendant read the form aloud; Defendant read it quickly and easily. Gregory asked, "Are you good with

5

that?," to which Defendant said he was, and indicated he understood his rights, including the right to refuse to let the officers search. An officer uncuffed Defendant's right hand and Defendant signed the consent-to-search form. (Govt Exh. 3.) Defendant executed the form at 7:05 p.m., about five minutes after the officers' initial entry.

Gregory asked Defendant several questions after Defendant signed the form, including who owned various items in the room. When the subject of Defendant's Camaro came up, Gregory told Defendant they would get it towed so it wouldn't be stolen. Gregory told Defendant he would be taken to the FBI office. Shortly thereafter, at around 7:20 p.m. (about twenty minutes after the officers' initial entry into the room), Defendant was taken to the FBI office.

At the FBI office, Defendant was escorted to an interview room at about 8:00 p.m. The subsequent interview was recorded (Govt. Exhs. 4A, 4B) and a transcript of the interview was prepared. (Govt. Exh. 5.) Gregory first asked Defendant if he needed to use the bathroom, which he did, and Gregory arranged for a bathroom break. Gregory then asked if Defendant wanted something to eat, because Defendant had earlier stated he had not had anything to eat since the day before. Gregory arranged for food to be brought to Defendant. At about 8:30 p.m., Gregory met with Defendant, summarized what had happened and said he wanted to talk to Defendant, but said he first needed to explain Defendant's rights. Gregory presented Defendant with a waiver of *Miranda* rights form, had him read it, and asked Defendant if he understood. Defendant said he understood before asking, "If I request a lawyer what happens?" Gregory indicated if that happens, "I can't speak to you." Defendant expressed concern about having to wait "for who knows how long," to which Gregory said that "won't be up to me," before explaining that Defendant could possibly be charged in either Kansas or Texas. The two then engaged in a discussion of possible charges before Gregory indicated this was an opportunity for Defendant to talk, although

Defendant was not required to do so, to which Defendant said he understood. After another discussion, at about 8:42 p.m., Defendant indicated "We can talk" and signed the waiver form. (Govt. Exh. 6.) He then answered Gregory's questions about the incident. In the course of the interview, Defendant also gave his permission for agents to take a DNA sample and to search his phone, laptop, and vehicle, and he signed consent forms authorizing each of the foregoing searches. (Govt. Exhs. 7-10.)

## II. Analysis

Defendant's motion argues that his arrest was an unlawful in-home arrest not supported by exigent circumstances or probable cause. (Doc. 20 at 5-9.) Defendant seeks suppression of all evidence derived from this allegedly unlawful seizure, including evidence of statements after arrest and evidence derived from the consent searches of his room, phone, computer, and vehicle. (*Id.* at 9.) In a supplemental motion, Defendant argues he was in custody for *Miranda* purposes once he was ordered out of the motel room and placed in handcuffs, that he was interrogated at the motel without the benefit of *Miranda* warnings, and that any statements made without the benefit of a warning and "the fruits" thereof should be suppressed. (Doc. 26.) For reasons that follow, the court concludes that the officers' entry into the motel room and their initial detention and subsequent arrest of Defendant were reasonable under the Fourth Amendment, that some of the statements made by Defendant at the motel may not be used at trial because they were not made with benefit of *Miranda* warnings, and that Defendant's waiver of *Miranda* warnings at the FBI was knowingly and voluntary given, as were his consents to search his room, car, phone, and computer.

*Entry into motel room and seizure of Defendant*. The Fourth Amendment provides in part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon

7

probable cause…." U.S. Const. Amend. IV. It is true that under this provision, warrantless searches are considered *per se* unreasonable, subject to only a few well-defined exceptions. *See City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2451-52 (2015). Moreover, "[g]uests in a motel room are similarly protected from warrantless entries." *United States v. Hendrix*, 664 F.3d 1334, 1338 (10th Cir. 2011) (citation omitted). But "[o]ne exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943 (2006). Under this "exigent circumstances exception," "police may enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury." *Id.* at 400. According to the Tenth Circuit, the exigency exists when: (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search are reasonable. *Armijo ex rel. Armijo Sanchez v. Peterson*, 601 F.3d 1065, 1070 (10th Cir. 2010) (citation omitted.) "In such an emergency, officers do not need probable cause." *Id.* (citing *Cortez v. McCauley*, 478 F.3d 1108, 1124 & n. 21 (10th Cir. 2007) (en banc).[1]

Under the evidence, Gregory and the other officers had an objectively reasonable basis to believe that L.M. was an occupant of the motel room and that she was imminently threatened with serious injury. *United States v. Najar*, 451 F.3d 710, 719 (10th Cir. 2006) ("The inquiry determining the existence of an exigency is essentially one of reasonable belief.") Gregory identified a reasonable factual basis for believing that L.M. was threatened with sexual contact or exploitation by an adult, including the fact that she was a 15-year old minor reported missing from

---

[1] The court understands the absence of a probable cause requirement to mean that officers entering a residence to protect the safety of an individual therein do not need probable cause to believe a crime is being committed in order to enter the residence, or to search for the individual and ensure that person's safety. The arrest of any person encountered therein, however, would still have to be supported by probable cause.

8

her home in Kansas; she had been seen on video in Kansas apparently kissing the driver of a car registered to Defendant shortly before her disappearance; Defendant's car was located at a motel in Houston; the motel registration listed the only occupants of Room 340 as Defendant and a person with L.M.'s first name (slightly misspelled) and the same last name as Defendant, thereby falsely implying a marital relationship; the two had been registered at the motel for several days; and Defendant, a 36-year old, had previously been contacted by police in connection with an investigation into indecency with a child. The threat to L.M. reasonably appeared to be serious, as the circumstances indicated a 15-year old child was at significant risk of being sexually exploited by an adult. *United States v. Gilliam*, 842 F.3d 801, 804 (2d Cir. 2016) (noting sexual exploitation of a minor has often been found to pose significant risk of serious bodily injury).

The threat was also reasonably considered imminent, as it was early evening and Defendant's unoccupied car in the parking lot suggested that Defendant and L.M. were likely in the motel room. The delay from seeking a judicial warrant at that point would have presented a substantial risk of allowing a sexual assault to occur when prompt intervention by the officers would likely assure L.M.'s safety. "The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 298–99, 87 S. Ct. 1642, 1646 (1967).

Some things cannot be undone. So it is with the sexual assault or exploitation of a child, and the risk of that irreversible harm is precisely the type of danger that can constitute exigent circumstances. *See Gilliam*, 842 F.3d at 804 (citing numerous cases finding exigent circumstances warranted entry into premises to avoid risk of injury to minor held therein). The officers' entry into the motel room to protect L.M. from serious harm under these circumstances was objectively

9

reasonable. The manner and scope of the search were also reasonable. The officers did not break open the door, but knocked just before opening it with a key card. Upon doing so, they did not enter the room but ordered Defendant out on the balcony, where they handcuffed him. They then removed L.M. from the room and took her a short distance away to verify her identity and ensure her safety, before conducting a sweep of the room to make sure no one else was inside. The court finds these actions were objectively reasonable and were properly limited in scope.

As indicated above, exigent circumstances permitted the officers to enter the motel room to search for L.M. and to protect her from imminent danger. The court further finds that the temporary detention of Defendant while officers cleared the room and spoke to L.M. was reasonable under the totality of circumstances. When a warrantless search of a residence is justified by exigent circumstances, as it was here, the legitimate interest of the police in protecting themselves and others from injury is no less than when officers execute a judicially-authorized search. *See United States v. Martins,* 413 F.3d 139, 150 (1st Cir. 2005) ('We hold...that police who have lawfully entered a residence possess the same right to conduct a protective sweep whether an arrest warrant, a search warrant, or the existence of exigent circumstances prompts their entry.") Agent Gregory plausibly explained why a temporary detention of any adult in the room would foster the safety of any juveniles present as well as the safety of the adult and the officers themselves. Officers could not have been certain how many occupants were in the room, if any were armed, or if anyone would react violently to the officers' intervention. In order to accomplish their legitimate purpose, officers needed to safely search for and find L.M., make sure she faced no threat of harm, and verify her identity and status. The small area involved – a standard motel room and a narrow upstairs balcony – gave officers reason to order Defendant out of the room and temporarily handcuff him while they verified L.M.'s identity and well-being in an area away from

Defendant. Additionally, while officers had no specific evidence that L.M. had been kidnapped, at the time of the entry they could not have known whether L.M. was present voluntarily or whether she was being held or extorted under threat of violence. Under the totality of circumstances, it was reasonable for the officers to temporarily detain Defendant while they identified and ensured L.M.'s safety, ensured that no one else on the premises was in danger, and ensured their own safety. *See United States v. Holloway*, 290 F.3d 1331, 1340 (11th Cir. 2002) (officers entering house under exigent circumstances had reasonable belief they were entering a volatile and potentially dangerous situation; "[a]s a result, officer safety demanded the individuals present on the premises be temporarily secured prior to conducting their search"); *Ratliff v. City of Three Rivers*, No. 05-cv-104, 2007 WL 475191, *9 (W.D. Mich. Feb. 9, 2007) (officers conducting lawful search of residence have the authority to detain occupants while the search is being conducted to minimize the risk of harm to the officers and to facilitate the search); *Bills v. Aseltine*, 958 F.3d 697, 704 (6th Cir. 1992) ("where an intrusion is justified, whether by warrant or by probable cause and exigent circumstances, police are temporarily placed in control of the premises and its occupants."). The safety interests furthered by a temporary seizure of Defendant, as compared to the intrusion upon Defendant's privacy interests, made the seizure objectively reasonable, at least for the limited period of time – here approximately one minute - from the officers' initial entry until Agent Gregory was able to speak with L.M. *Cf. Muehler v. Mena*, 544 U.S. 93, 99, 125 S. Ct. 1465 (2005) (in executing a search warrant, the officers' use of handcuffs to detain resident "was reasonable because the governmental interests outweigh the marginal intrusion."); *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993) (quoting *United States v. Hensley*, 469 U.S. 221, 235, 105 S. Ct. 675 (1985) ("Since police officers should not be required to take unnecessary risks in performing their duties, they are 'authorized to take such steps as [are]

reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a *Terry*] stop.'")).

The court also finds the initial protective sweep of the motel room was reasonable under the exigent circumstances doctrine. *See United States v. Walker*, 474 F.3d 1249, 1254 (10th Cir. 2007). *Walker* indicated a sweep of this sort might not be justified solely by concerns about officer safety, but could be justified by a threat to civilian safety. *Id*. *See also Armijo,* 601 F.3d at 1072 (a sweep may be proper under the exigent circumstances doctrine "if reasonable grounds [exist] to search to protect the safety of someone besides the officers.")[2] For the reasons indicated above, including Agent Gregory's knowledge of the nature of sexual exploitation crimes in Houston, the officers had a reasonable basis for believing that L.M. could be at risk of serious harm from other adults in the room or that other juveniles at risk of harm could be inside the room. Officers thus reasonably perceived a threat of serious harm to civilians that justified a cursory sweep of the motel room to ensure that no other individuals were inside.

Within one minute of Defendant's initial detention, Agent Gregory spoke with L.M. and was informed that L.M. and Defendant had a sexual relationship. At that point, the officers obviously had probable cause to believe Defendant had committed a felony. *See e.g.,* Tex. Penal Code Ann. § 21.11 (West) (prohibiting sexual contact with a child under 17 years of age); 18 U.S.C. § 2423 (prohibiting interstate transportation of person under 18 years of age with intent to engage in unlawful sexual activity). Defendant's seizure from that point on was reasonable for

---

[2] *Cf. United States v. Aguirre*, No. 16-CR-0027, 2016 WL 1464574, *14 (N.D. Okla. 2016). In *Aguirre*, Judge Eagan questioned *Walker* and *Armijo's* suggestion that a protective sweep in exigent circumstances could not be based solely on concerns for officer safety. Judge Eagan noted that in *Kentucky v. King*, 563 U.S. 452, 131 S. Ct. 1849 (2011), the Supreme Court emphasized that the "touchstone of the Fourth Amendment is reasonableness," and that "warrantless searches are allowed when the circumstances make it reasonable, within the meaning of the Fourth Amendment, to dispense with the warrant requirement." *King*, 563 U.S. at 461, 470. Because of that, "the exigent circumstances rule justifies a warrantless search when the conduct of the police preceding the exigency is reasonable in the same sense." *Id*. Judge Eagan questioned whether "the absolute rule" of *Walker* and *Armijo* is consistent with the Supreme Court's "reasonableness standard." *Aguirre*, 2016 WL 1464574, at *14.

12

either of two reasons. First, it was reasonable because officers had probable cause to arrest him for a felony and he was in a public place.³ *See United States v. Watson*, 423 U.S. 411, 418, n.6 (1976) (warrantless arrest in public place is reasonable if police have probable cause to believe suspect committed felony). Although Defendant was in a public area (the balcony of the motel) because officers had ordered him out of his motel room, his removal from the room was separately justified by the officers' search for L.M. and was reasonable under the Fourth Amendment. Defendant was thus lawfully in police custody in a public place when L.M.'s statement to police gave them probable cause to arrest him. Second, even if the public place doctrine did not apply under these circumstances, the arrest was nevertheless reasonable because the officers' entry into the motel room was justified by exigent circumstances and, while officer were lawfully present with Defendant, they developed probable cause to arrest him.

Defendant argues his arrest was unlawful under *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), but that case held that "*absent another exception such as exigent circumstances*, officers may not enter a home to make an arrest without a warrant, even when they have probable cause." *Collins v. Virginia*, 138 S. Ct. 1663, 1672 (2018) (emphasis added) (citing *Payton*, 445 U.S. at 587-90). The *Payton* rule is based on the fact that "being 'arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home.'" *Id*. (citing *Payton*, 445 U.S. at 588-89.) *See also Kentucky v. King*, 563 U.S. at 460, 131 S.Ct. at 1856 ("Absent exigent circumstances, that threshold [to the home] may not reasonably be crossed without a warrant.") (quoting *Payton*, 455 U.S. at 590.); *United States v. Reed*, 572 F.2d 412, 423 (2d Cir. 1978) ("[W]e hold that, in the absence of a warrant to arrest a

---

³ In view of the court's finding that the officers' entry into the room and their initial detention of Defendant were justified by exigent circumstances and attendant safety concerns, the court need not determine whether, prior to L.M.'s statement to Gregory, officers had probable cause to believe Defendant had committed a felony.

suspect at home, *and in the absence of exigent circumstances*," federal law enforcement officers are prohibited by the Fourth Amendment from entering the home of a suspect to effect a felony arrest….") But in this case, the entry into the motel room and the search for L.M. were justified by exigent circumstances. Safety considerations attendant to the search justified temporarily seizing Defendant while officers determined L.M.'s identity and status. As such, *Payton* does not control. There is no evidence to suggest that officers ordered Defendant out of his room to circumvent the warrant requirement. Nor does Defendant cite any case law showing that, despite the police being lawfully present and having lawful custody of him when probable cause to arrest developed, officers were nevertheless obligated to release him and seek a warrant for his arrest. For all of the foregoing reasons, the court finds Defendant's detention and arrest were reasonable under the Fourth Amendment.

*Pre-Miranda statements*. The court next addresses Defendant's motion to suppress evidence of custodial statements made by him in the motel room. Under *Miranda v. Arizona*, 384 U.S. 436 (1966), a person in police custody generally must be given a set of warnings (including notification of the right to remain silent and the right to counsel) before being subjected to interrogation. A person is "in custody" for *Miranda* purposes "when he has been arrested or his freedom is curtailed to a degree associated with a formal arrest." *United States v. Wagner*, 2018 WL 3458520, *4 (D. Kan. July 18, 2018) (citations omitted); *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517 (1983). The government concedes Defendant was in custody for *Miranda* purposes from the time he was first placed in handcuffs. (Doc. 31 at 4.) But it argues that Agent Gregory's questions after that point fell "within several long-standing exceptions" to *Miranda*, including "routine booking" questions, "general on-the-scene" questions, and the "public safety exception." (*Id*. at 1.)

14

Under *Miranda*, the interrogation that triggers a need for warnings "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Yepa*, 862 F.3d 1252, 1257 (10th Cir. 2017), *cert. denied,* 138 S. Ct. 1262, 200 L. Ed. 2d 427 (2018) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)). The court asks "whether the officers 'should have known that their words or actions—whether framed as a question or not—were reasonably likely to elicit an incriminating statement.'" *Id*. (citing *United States v. Cash*, 733 F.3d 1264, 1277 (10th Cir. 2013)). "This is an 'objective [inquiry,] ... and we focus on the perceptions of a reasonable person in the suspect's position rather than the intent of the investigating officer.'" *Id.* (internal quotation marks omitted)

The court first finds that the officer's question to Defendant on the balcony, "How old is your wife?", amounted to interrogation within the meaning of *Miranda*. Even if the officer intended it as an explanation rather than an inquiry (it was clearly prompted by Defendant asking why he was being taken into custody), it was nevertheless framed as a question and the nature of the remark made it reasonably likely to elicit an incriminating response. *See Jacobs v. Singletary*, 952 F.2d 1282, 1291 n. 7 (11th Cir. 1992) (rejecting argument that the rhetorical nature of a question precluded application of *Miranda*). It is debatable whether a jury would consider Defendant's reaction or response ("Excuse me?") to be incriminating, but out of an abundance of caution the court will exclude evidence of the question and response from the trial.

Several of the questions posed to Defendant after he was taken back into the motel room also constituted interrogation within the meaning of *Miranda*. Those questions included whether Defendant knew why officers were there, whether there "was anything else going on," and whether

15

L.M. had engaged in sex with Defendant or with others. The government fails to show the *Miranda* rule does not apply to these questions. The booking exception holds that questions about biographical information needed for the booking process – including name and address – fall outside of *Miranda's* protections. *Pennsylvania v. Muniz*, 496 U.S. 582, 601, 110 S. Ct. 2638, 110 L. Ed. 528 (1990). Accordingly, there was no problem with asking Defendant his name. Questions about clothing and medication in the room would also likely qualify under this exception.[4] But asking whether Defendant knew why officers were there did not seek booking information; it was a question reasonably likely to elicit an incriminating response. Similarly, the agent's explanation to Defendant of the evidence against him included questions seeking Defendant's response. *Miranda* warnings are required before responses to such questions can be used against a defendant at trial. As for "general on-the-scene questioning," as noted in *United States v. Couch*, 2013 WL 27294, *4 (D. Kan. Jan. 24, 2013), that is not actually an exception to *Miranda*. It refers to questioning people at the scene of a crime who are not in custody. *See Miranda*, 384 U.S. at 477 ("Such investigation may include inquiry of persons not under restraint.") Once a person is in custody, *Miranda* applies. Finally, the public safety exception, which was recognized in *New York v. Quarles*, 467 U.S. 649, 104 S. Ct. 2626, 81 L.Ed.2d 550 (1984), arose because police in that case had reason to believe a suspect hid his gun in a grocery store, and an officer asked him where the gun was before giving *Miranda* warnings. The Supreme Court ruled officers can question a suspect prior to warnings if the questions arise out of "an objectively reasonable need to protect the police or the public from any immediate danger associated with a weapon." *United States v. DeJear*, 552 F.3d 1196, 1201 (10th Cir. 2009) (quoting *Quarles*, 467 U.S. at 659 n.8.) Doing so is

---

[4] The government argues that several questions by Agent Gregory about things in the motel room that Defendant "might need for transport," such as clothing and medication, fell within the exception for booking questions. To the extent the government intends to use any of Defendant's responses to such questions at trial, it must file a motion in limine prior to trial identifying the statements and seeking a ruling on their admissibility.

permissible because "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Quarles*, 467 U.S. at 657. At least one of the questions asked of Defendant in this case – i.e., whether there was anything in the room that could hurt the officers if they searched it – fell within this exception. *See United States v. Newsome*, 475 F.3d 1221 (11th Cir. 2007) (officer permissibly asked arrested defendant, before *Miranda* warnings, "is there anything or anyone in the room I should know about," after which defendant disclosed the location of a gun); *United States v. Thompson*, 591 F. App'x 652, 658 (10th Cir. 2014) (noting the court has "applied the ... public safety exception to allow an officer to ask a suspect, 'Do you have any guns or sharp objects on you?' without first giving the *Miranda* warnings.") But the government has not shown the exception applies to other questions, such as whether Defendant or others had engaged in sex with L.M. The government argues such questions "related to officer safety and the safety of the minor." (Doc. 25 at 5.) But the government cites no authority for its argument and fails to explain how police had a pressing need for this information to protect against an *immediate danger* to L.M.'s safety or the safety of the public. Officers had already conducted a sweep of the motel room and had Defendant in custody. The government shows no objectively reasonable basis for believing there was such an immediate danger to safety.

Defendant's supplemental motion to suppress statements will accordingly be granted in part. The court will exclude evidence of the pre-*Miranda* questions and responses indicated above, including whether Defendant knew why officers were there, whether "anything else" was going on, and whether L.M. had engaged in sex with Defendant or with others. The statements were made without the benefit of *Miranda* warnings and will therefore be excluded from the government's case-in-chief at trial. At the same time, the court finds Defendant's statements were

17

made voluntarily within the meaning of the Fifth Amendment. *See United States v. Cordova*, 340 F. App'x 427, 2009 WL 2351618 (10th Cir. 2009) (listing factors included in consideration of voluntariness). Defendant is of mature age and appears to be of at least average intelligence; the length of his detention and questioning at the motel was exceedingly brief; he was not advised of his right to remain silent and was questioned in a police-dominated atmosphere, but he was not subjected to any physically improper tactics, trickery, or coercion to compel him to make a statement. Agent Gregory was polite and professional at all times and did nothing to overcome Defendant's ability to decide whether to make a statement. The totality of circumstances shows Defendant chose to respond to questions at the motel of his own free will.

*Consent to search motel room*. Defendant orally gave officers consent to search his motel room and executed a written consent form pertaining to the room. (Govt. Exh. 3.) Defendant's motion to suppress did not specifically challenge the voluntariness of this consent. Rather, it argued the consent was tainted by an unlawful arrest. (Doc. 20 at 9-10.) Similarly, his supplemental motion requested suppression of statements made without Miranda warnings but did not challenge the voluntariness of consent. (Doc. 26 at 6.) *See also United States v. Curls*, 219 F.App'x 746, 754-55 (10th Cir. 2007) (noting Tenth Circuit precedent that officer's request for consent to search does not constitute "interrogation" for *Miranda* purposes). As indicated previously, the court finds Defendant's arrest was not unlawful, and accordingly the consent was not tainted.[5]

---

[5] The totality of circumstances showed that Defendant's consent to search the motel room was given freely and voluntarily. Agent Gregory, who asked for and obtained the consent, did not employ any improper coercive means. He was professional and polite throughout what was a relatively brief encounter. He used a calm tone, employed no threats or trickery, and went out of his way to explain to Defendant more than once that he had a right to refuse consent for a search. Defendant orally consented to a search and then, after having several minutes to think about it, executed a written form granting consent for the search. The circumstances showed clearly that his decision to do so was voluntary and not a product of improper coercion. *See e.g., United States v. Dozal*, 173 F.3d 787, 796 (10th Cir. 1999) (consent was voluntary despite being in custody without *Miranda* warning).

*Miranda waiver and consent forms at FBI office*. Defendant's supplemental motion to suppress only specifically challenges the use of Defendant's statements in the motel room. It does not address statements by Defendant at the FBI office after he was given *Miranda* warnings and agreed to talk to Agent Gregory. (Doc. 26 at 6.) The motion merely asks for suppression of "the fruits of the government's unlawful … [initial] interrogation" of Defendant. *Id.*

Judge Crabtree summarized the relevant standards in *United States v. Lawton*, 216 F.Supp.3d 1281, 1294-95 (D. Kan. 2016):

> The Supreme Court has held that the "subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Oregon v. Elstad*, 470 U.S. 298, 314, 105 S. Ct. 1285, 84 L.Ed.2d 222 (1985). In *Elstad*, the Supreme Court rejected the theory that "the initial, unwarned statement creates a 'lingering compulsion'" that necessarily excludes later statements given after *Miranda* warnings. *United States v. Carrizales–Toledo*, 454 F.3d 1142, 1149 (10th Cir. 2006) (quoting *Elstad*, 470 U.S. at 311, 105 S. Ct. 1285)). And, in *Missouri v. Seibert*, the Supreme Court, in a plurality opinion, listed five relevant facts that bear on whether *Miranda* warnings given midstream are effective. 542 U.S. 600, 601, 124 S. Ct. 2601, 159 L.Ed.2d 643 (2004). They are: (1) the completeness and detail of the questions and answers to the first round of questioning; (2) the overlapping content of the two statements; (3) the timing and setting of the first and second interrogation; (4) the continuity of police personnel; and (5) the degree to which the interrogator's questions treated the second round as continuous with the first. *Carrizales–Toledo*, 454 F.3d at 1150 (discussing *Seibert*, 542 U.S. at 615, 124 S. Ct. 2601).

Under these standards, Defendant's statements after receiving *Miranda* warnings at the FBI office are not subject to suppression. As an initial matter, Defendant's unwarned statements at the motel room were voluntary within the meaning of the Due Process Clause. Moreover, the evidence showed Defendant was fully apprised of his *Miranda* rights at the FBI office and made a knowing and voluntary waiver of those rights. Prior to questioning at the office, Agent Gregory made sure Defendant was given something to eat and was allowed a bathroom break. Gregory then went over the *Miranda* rights form with Defendant in detail, including the right to remain silent and the right to a lawyer, before Defendant agreed to talk and signed a waiver. (Govt. Exh. 6.)

Under the *Elstad* and *Seibert* standards noted above, there was nothing about the failure to give *Miranda* warnings at the motel that would taint or vitiate the knowing and voluntary nature of Defendant's subsequent waiver at the FBI office. Nothing suggests the officers used a "two-step" tactic to "soften up" Defendant at the motel. *See Seibert*, 542 U.S. at 610-11. Defendant's statements at the motel were cursory and barely touched upon the extensive matters he later talked about with Gregory at the FBI office. *Id.* at 615 (noting *Elstad* "rejected the 'cat out of the bag' theory that any short, earlier admission, obtained in arguably innocent neglect of *Miranda*, determined the character of the later, warned confession"). Defendant was given a significant break, including a meal, before he was interrogated at the FBI office. Agent Gregory in both instances was exceedingly polite and attempted no deceit, tricks, or improper coercion. The circumstances also indicated that Defendant is of mature age, of at least average intelligence, and that he fully understood the nature of his decision at the FBI office to waive his rights and speak to the agent. Equally voluntary and knowing were Defendant's execution of consent forms allowing agents to collect a DNA sample and search his car, computer, and phone. Accordingly, the motion to suppress is denied insofar as Defendant seeks to suppress evidence of these items.

IT IS THEREFORE ORDERED that Defendant's Motion to Suppress (Doc. 20) is DENIED; Defendant's Supplemental Motion to Suppress (Doc. 26) is GRANTED IN PART AND DENIED IN PART. The motion is granted with respect to the custodial statements identified in this order as being excluded from the government's case-in-chief at trial.

DATED this 18th day of September, 2018.

                                              ___s/ John W. Broomes_____
                                              JOHN W. BROOMES
                                              UNITED STATES DISTRICT JUDGE